UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,       :
                                     :
          -against-           :
                                     :         **OPINION AND ORDER**
SHAUN TAYLOR and TIMOTHY PINKNEY, :         10-CR-268 (DLI)
                                     :
                  Defendants.     :
-------------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

Defendants Shaun Taylor ("Taylor") and Timothy Pinkney ("Pinkney," together with Taylor, "defendants") are charged with various narcotics trafficking, firearms, and murder offenses in a twelve-count superseding indictment ("Superseding Indictment") filed on December 17, 2012. (*See* Superseding Indictment, Doc. Entry No. 88.) By motion dated March 3, 2014, the government moves *in limine* for an anonymous jury, to admit evidence of defendant Pinkney's prior bad acts, and to admit evidence of defendant Taylor's shooting of an individual identified as "V1." (Government's Memorandum of Law in Support of its Motion for an Anonymous and Partially Sequestered Jury and to Admit Uncharged Acts ("Gov. Mem."), Doc. Entry No. 130.) By motion dated March 3, 2014, defendant Taylor moves to sever his trial from that of his co-defendant. (Shaun Taylor's Pre-Trial Severance Motion ("Taylor Mem."), Doc. Entry No. 129.) In his opposition to the government's motion *in limine*, Taylor also moves for reconsideration of the Court's prior order dated November 14, 2012 admitting evidence of Taylor's prior bad acts and for disclosure of *Brady* material. (Defendant Shaun Taylor's Memorandum of Law in Opposition to the Government's Motion for an Anonymous Jury and for Other Relief ("Taylor Resp."), Doc. Entry No. 131.) By motion dated March 3, 2014, defendant Pinkney moves *in limine* for suppression of his recorded statement to a confidential informant, as

well as to compel the government to clarify what *Brady* material exists and provide him with a bill of particulars. (Memorandum of Law in Support of Defendant Pinkney's Omnibus Motion ("Pinkney Mem."), Doc. Entry No. 127.) For the reasons set forth below the government's motions are granted in their entirety; defendant Taylor's severance motion and motion for reconsideration are denied; and defendant Pinkney's motion is denied.

## I. The Superseding Indictment

The charges in the Superseding Indictment stem from defendants' alleged involvement in a decade-long narcotics trafficking conspiracy. (Superseding Indictment; Gov. Mem. at 2.) Defendant Taylor is charged with: (1) one count of conspiracy to distribute and possess with the intent to distribute heroin, cocaine, and cocaine base ("crack"); (2) one count each of drug-related murder and drug-related murder conspiracy for the murder of Terrance Barnett; (3) two counts of cocaine distribution; (4) one count each of murder-for-hire and murder-for-hire conspiracy for the murder of Joseph Vargas; (5) one count each of drug-related murder and drug-related murder conspiracy for the murder of Joseph Vargas; (6) two counts of use, discharge, and brandishing of a firearm; and (7) one count of causing death with a firearm. (Superseding Indictment ¶¶ 1-12.) Defendant Pinkney is charged with: (1) one count of conspiracy to distribute and possess with the intent to distribute heroin, cocaine, and crack; (2) one count each of drug-related murder and drug-related murder conspiracy for the murder of Terrance Barnett; and (3) one count of use, discharge, and brandishing of a firearm. (Superseding Indictment ¶¶ 1-3, 10.)

The government alleges that defendant Taylor was the leader of a narcotics trafficking conspiracy in the Bushwick neighborhood of Brooklyn, New York and the Woodhaven neighborhood of Queens, New York that was responsible for two homicides and numerous non-

fatal shootings between January 2, 2000 and August 2, 2010. (Gov. Mem. at 1, 3; Superseding Indictment ¶¶ 1, 2, 8, 12.) Pinkney is alleged to have acted as an enforcer in the conspiracy. (Gov. Mem. at 1.) Defendants allegedly conspired to distribute kilograms of heroin and cocaine and hundreds of grams of crack. (Gov. Mem. at 3; Superseding Indictment ¶¶ 1, 4-5.) On April 29, 2005, defendants allegedly conspired to murder Terrance Barnett ("Barnett"). (Superseding Indictment ¶¶ 2-3.) Pinkney is alleged to have murdered Barnett at Taylor's behest in exchange for $1,000. (Gov. Mem. at 4.) On or about June 20, 2007, Taylor allegedly hired two coconspirators, Jaquan Petty and D'Andrew Yelverton, to murder Joseph Vargas ("Vargas") in exchange for narcotics. (Gov. 8/20/12 First Motion *In Limine* at 5, Doc. Entry No. 65; Superseding Indicment ¶¶ 6-9, 12.) Later that day, Taylor allegedly provided Yelverton with a firearm, which Yelverton, acting together with others, then used to shoot Vargas to death. (*Id.* at 5-6.)

## II.     Pinkney's Motion to Suppress

Defendant Pinkney moves to suppress the recorded statement he made to a confidential informant ("CI") on the grounds that it was obtained in violation of Pinkney's constitutional rights under the Fifth and Six Amendments to the United States Constitution and in violation of the American Bar Association's ("ABA's") Code of Professional Responsibility. (Pinkney's Mem. at 2.) According to Pinkney, "to the extent [that] Pinkney's recorded statements to [the CI] related to the . . . conspiracy for which Pinkney was interrogated previously[,] said recording was obtained in violation of his *Miranda* rights and right to counsel and thus must be suppressed." (*Id.* at 4.) The government opposes, arguing that Pinkney's Fifth and Sixth Amendment right to counsel had not attached at the time his statement was made, and that the prosecutors did not commit any ethical violation. (Gov. Resp. at 12-15.) For the reasons set

forth below, Pinkney's motion to suppress is denied in its entirety.

a.      *Pinkney's Recorded Statement*

On March 9, 2009, defendant Pinkney was arrested after New York City Police Department ("NYPD") officers executed a search warrant at his residence in Brooklyn and discovered two firearms, marijuana packaged for street-level distribution, and currency. (Pinkney Mem. at 2; Gov. Resp. at 2, Doc. Entry No. 132.)  Pinkney was charged in Kings County Supreme Court with drug possession and two counts of felony gun possession (the "Kings County case").  (Pinkney Mem. at 2; Gov. Resp. at 2.)  On January 30, 2010, while released on bail in the Kings County case, Pinkney was arrested in Pennsylvania for an unrelated weapons offense (the "Pennsylvania case").  (Pinkney Mem. at 2; Gov. Resp. at 2.)  On August 31, 2010, Pinkney pled guilty to felony possession of a firearm without a license in the Pennsylvania case.  (Pinkney Mem. at 2; Pinkney Decl. ¶ 5, Doc. Entry No. 127-1; Gov. Resp. at 2.)

On February 25, 2011, Pinkney failed to appear in court in the Kings County case due to his incarceration in Pennsylvania, and a bench warrant was issued.  (Pinkney Mem. at 2-3; Pinkney Decl. ¶ 7.)  On April 8, 2011, Pinkney was "returned to Kings County Supreme Court to vacate [the] warrant."  (Pinkney Decl. ¶ 7.)  In April 2011, NYPD Detectives (the "Detectives") visited Pinkney while he was detained at Rikers Island pending resolution of the Kings County case.  (Pinkney Mem. at 3; Pinkney Decl. ¶¶ 8-9; Gov. Resp. at 2.)  While Pinkney claims that the Detectives interrogated him and threatened to transfer the Kings County case to federal court, the government contends that the Detectives visited Pinkney to "gauge his interest in potentially cooperating in an ongoing criminal investigation of the Barnett homicide and other crimes related to the instant case."  (Pinkney Mem. at 3; Pinkney Decl. ¶¶ 8, 10; Gov. Resp. at 2.)

4

According to the government, the Detectives "elected not to interrogate Pinkney, and thus did not give him *Miranda* warnings." (Gov. Resp. at 2-3.) On May 4, 2011, Pinkney pled guilty in the Kings County case and, thereafter, was sentenced to concurrent three-to-six-year prison terms. (Pinkney Mem. at 3; Pinkney Decl. ¶ 11; Gov. Resp. at 3.) Pinkney then was returned to Pennsylvania to complete his term of incarceration. (Pinkney Mem. at 3.)

In January 2012, Pinkney was brought from state custody in Pennsylvania to this district on a writ of habeas corpus *ad testificandum* and housed at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. (Pinkney Mem. at 3; Pinkney Decl. ¶¶ 12-13; Gov. Resp. at 3.) On January 17, 2012, Pinkney was transported from the MDC to the United States Courthouse for the Eastern District of New York, in Brooklyn to meet with the same Detectives who had visited him at Rikers Island and a special agent with the Federal Bureau of Investigation ("FBI"). (Pinkney Mem. at 3; Pinkney Decl. ¶ 14; Gov. Resp. at 3.) Pinkney claims that the Detectives and FBI agent interrogated him while he was at the Brooklyn federal courthouse. The government, however, maintains that the officials again elected not to interrogate Pinkney, an, instead, encouraged him to cooperate in the ongoing investigation. (Pinkney Mem. at 3; Pinkney Decl. ¶ 14; Gov. Resp. at 3.) Pinkney also claims that he was not offered an attorney until the end of the questioning, nor was he advised of his *Miranda* rights. (Pinkney Mem. at 3; Pinkney Decl. ¶ 15.) Pinkney further asserts that he was told he was going to be indicted and he requested an attorney. (Pinkney Mem. at 3.) The government, on the other hand, maintains that Pinkney "invited" the government to indict him for the Barnett murder and indicated that he did not want to meet with an attorney. (Gov. Resp. at 3.) Notably, in his declaration submitted in support of his motion, Pinkney does not state that he requested an attorney at any time during this meeting. (*See* Pinkney Decl.)

While Pinkney was detained at the MDC, the government received information from an individual who shared a cell with Pinkney that Pinkney *sua sponte* had confessed to three homicides and several shootings. (Gov. Resp. at 4.) The individual agreed to become a confidential informant for the government. (*Id.*) On November 20, 2012, Pinkney had a two-hour conversation with the CI, who was equipped with a recording device. (Pinkney Mem. at 3; Gov. Resp. at 2; Gov. Mem at 4.) The CI mentioned Taylor "in the hope that Pinkney would speak about the Barnett murder," and Pinkney "proceeded to admit to the Barnett murder, two additional murders and several other crimes of violence." (Gov. Resp. at 4-5.) Specifically, Pinkney stated that Taylor had offered him money to kill Taylor's former drug supplier. (*Id.* at 5.) After Taylor drove Pinkney to the murder scene and pointed out the victim, Pinkney walked up to the victim and shot him several times in the head. (*Id.*) Although Taylor believed that Barnett was a rival, Barnett actually was an innocent victim, killed by Pinkney in a case of mistaken identity. (Gov. Mem. at 4.) Pinkney stated his "vehement dislike" for Taylor and belittled "Taylor's toughness, recounting that Taylor was hesitant before shooting Pinkney and asked Pinkney to kill his drug rival rather than shooting the man himself." (Gov. Resp. at 4.) In contrast, Pinkney "touted his own willingness to commit acts of violence." (*Id.* at 4-5.)

b. *Fifth Amendment Claim*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that the Fifth Amendment privilege against self-incrimination "prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 294 (1990) (citing *Miranda*, 384 U.S. 436 (1966)); *see also Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (noting that, in *Miranda*, the Supreme

Court "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation"). "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody.'" *Perkins*, 496 U.S. at 296.

The Fifth Amendment is not implicated, and *Miranda* warnings are not necessary, when a suspect is unaware that he is speaking to a government agent and voluntarily gives a statement. *Perkins*, 496 U.S. at 294. This is because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* at 296; *see also Howes v. Fields*, __ U.S. __,132 S.Ct. 1181, 1187 (2012) (noting that the Supreme Court in *Perkins* "rejected the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent").

Even where a suspect is aware that he is speaking to a government official, *Miranda* warnings are not necessary unless the statements are made in the course of a "custodial interrogation." *See Shatzer*, 559 U.S. at 113 ("lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*"). In the Fifth Amendment context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 132 S.Ct. at 1189. "[I]mprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Id.* at 1190. To determine whether a person is in custody, courts must "ascertain whether, in light of 'the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 1189.

Here, Pinkney's confession was not made in a police dominated atmosphere. Pinkney

was unaware that the CI was a government informant, and he made the statement at issue voluntarily to a fellow cellmate. Notably, Pinkney voluntarily made incriminating statements to the CI *before* the CI became a government informant. He does not challenge the admissibility of this prior, unrecorded statement. The record also shows that Pinkney was not in custody for the purposes of *Miranda* or subject to any coercive pressures when he made the statement he seeks to suppress. Although Pinkney was incarcerated at the time he made the statement, Pinkney was not physically restrained or in any way coerced into continuing the conversation. Indeed, he was free to end the conversation at any time. Pinkney spoke freely, candidly, in detail, and at length to someone he viewed as a fellow inmate. Thus, "the fears motivating exclusion of confessions are simply not present in the case at bar." *Alexander v. State of Conn.*, 917 F.2d 747, 751 (2d Cir. 1990).

Since the Fifth Amendment right to counsel did not attach, it is irrelevant whether Pinkney invoked his right to counsel in a previous meeting with government officials. *Id.* (holding that "[r]egardless of whether [the defendant] properly invoked his right to counsel, there is no support for the concept of a fifth amendment right to counsel which bars conduct not prohibited by *Miranda* itself"). As such, despite the existence of a factual dispute between Pinkney and the government as to whether Pinkney had requested an attorney, there is no need for a hearing on this issue. For all of the foregoing reasons, the Court finds that Pinkney's Fifth Amendment rights were not implicated when he confessed to the CI and suppression is not warranted on this basis. Defendant Pinkney's motion to suppress on this ground is denied.

    c.    *Sixth Amendment Claim*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. Const.

amend. VI. The Sixth Amendment right to counsel does not attach until "a prosecution is commenced, that is 'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Mapp*, 170 F.3d 328, 334 (2d Cir. 1999) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). "Moreover, the right is offense-specific." *Id.* In other words, "the government does not violate the Sixth Amendment rights of a defendant charged with a crime by investigating or interrogating that defendant with regard to a separate crime that has not been charged." *United States v. Jacques*, 684 F.3d 324, 331 (2d Cir. 2012); *Mapp*, 170 F.3d at 334 (finding that federal authorities did not violate the defendant's Sixth Amendment rights where, before federal charges were filed, defendant was transported to a federal courthouse and placed in a cell with a cooperating witness while defendant was serving a state sentence for a crime unrelated to the federal charges).

Here, no Sixth Amendment right to counsel had attached at the time of Pinkney's confession to the CI, because, as Pinkney concedes, no charges were pending against him in any jurisdiction for the crimes charged in this case. (Pinkney Mem. at 4.) The fact that he was serving a prison term for unrelated state law convictions in New York and Pennsylvania is irrelevant for purposes of the Sixth Amendment analysis. The cases cited by Pinkney are not to the contrary. *See Texas v. Cobb*, 532 U.S. 162 (2001) (holding that the Sixth Amendment right to counsel is offense specific); *Alexander*, 917 F.2d at 751 (noting that the Supreme Court's decisions in *Massiah v. United States*, 377 U.S. 201 (1964), *United States v. Henry*, 447 U.S. 264 (1980), and *Maine v. Moulton*, 474 U.S. 159 (1985) "preclude the government from using an undercover agent to circumvent the sixth amendment right to counsel once a suspect has been charged with the crime"). Accordingly, the Sixth Amendment does not require that Pinkney's

statement be suppressed under the circumstances presented here and his motion to suppress on this ground is denied.

d.    *Disciplinary Rule*

Pinkney also contends that his statement should be suppressed because the prosecutors investigating this case violated Rule 4.2 of the ABA's Code of Professional Responsibility ("Rule 4.2" or the "Rule")[1] by facilitating the recording.  (Pinkney Mem. at 6-10).  Rule 4.2 provides that

> [i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Rule 4.2.    Rule 4.2 applies to federal prosecutors conducting pre-indictment criminal investigations, and it is within the discretion of the district court to order suppression if a violation is found to have occurred.  *United States v. Hammad*, 858 F.2d 834, 837, 839-40 (2d Cir. 1988); *United States v. Jamil*, 707 F.2d 638, 645 (2d Cir. 1983)).  However, the terms of the Rule "should be construed narrowly in the interests of providing fair notice to those affected by the Rule and ensuring vigorous advocacy not only by defense counsel, but by prosecutors as well."  *Grievance Comm. for S. Dist. of New York v. Simels*, 48 F.3d 640, 650 (2d Cir. 1995).

In *Hammad*, a case relied upon by Pinkney, a federal prosecutor provided a government informant with a sham grand jury subpoena in order to induce incriminating statements from the target of a federal criminal investigation.  858 F.2d 834.  The Second Circuit Court of Appeals found that the prosecutor had violated Rule 4.2 because the prosecutor's misconduct "contributed to the informant's becoming the alter ego of the prosecutor."  *Id.* at 840.  However,

---

[1] Although Pinkney cites Rule 7-104 of the ABA's Code of Professional Responsibility in his submissions, Rule 4.2 had replaced Rule 7-104 by the time Pinkney made the statement at issue.  Thus, the Court refers to Rule 4.2 in its analysis.

the court in *Hammad* "urge[d] restraint in applying the Rule in the pre-indictment context so as not to unduly hamper legitimate law enforcement investigations." *Simels*, 48 F.3d at 649. The court noted that use of legitimate investigative techniques, including the use of informants to gather evidence, usually would be permissible. *Hammad*, 858 F.2d at 839. Despite its finding that the prosecutor had violated the Rule, the Second Circuit found that the district court abused its discretion in suppressing the recordings obtained as a result of the investigation. *Id.* at 837 (noting that suppression of evidence is an extreme remedy and that the law governing application of the disciplinary rule previously was unsettled).

As an initial matter, it is not clear that Rule 4.2 applies in this case, since Pinkney was not represented by counsel in connection with the subject matter of the investigation with which the CI was assisting the government at the time of his confession. *See* Rule 4.2 (prohibiting a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer *in the matter*) (emphasis added); *Hammad*, 858 F.2d at 839 (noting that the question present in *Hammad* was the extent to which the Rule restricted the use of informants by government prosecutors "prior to indictment, but after a suspect has retained counsel *in connection with the subject matter of a criminal investigation*") (emphasis added).

Even assuming, *arguendo*, that Pinkney was represented by counsel for the purposes of Rule 4.2, this case does not involve the type of egregious misconduct present in *Hammad*. The narrow rule announced in *Hammad* has been "applied repeatedly by courts in this circuit to confirm the propriety of undercover recordings of represented but unindicted targets, and to deny motions to suppress the resulting statements." *United States v. Binday*, 908 F. Supp. 2d 485, 496 (S.D.N.Y. 2012) (collecting cases) (noting that *Hammad* is the only case in this Circuit finding misconduct sufficiently egregious to constitute a violation of Rule 4.2). Here, the government's

use of the CI was a legitimate investigative technique authorized by law under Rule 4.2, and Pinkney has not alleged any facts that persuade the Court otherwise. Even if there were a potential violation of the Rule, the Court would find that suppression of the evidence at issue is not warranted under the circumstances of this case.

Accordingly, having found that no violation of Rule 4.2 occurred, and that Pinkney's right to counsel under the Fifth and Sixth Amendments had not yet attached at the time of his statement to the CI, Pinkney's motion for suppression is denied in its entirety.

## III. Taylor's Motion to Sever

Defendant Taylor moves to sever his trial from that of his co-defendant pursuant to Federal Rule of Criminal Procedure 14(a) and *Bruton v. United States*, 391 U.S. 123 (1968). Specifically, Taylor contends that admission of Pinkney's "facially incriminating confession" would deprive Taylor of his "Sixth Amendment right of confrontation." (Taylor Mem. at 2.) The government opposes, arguing that *Bruton* applies only to testimonial statements and that Pinkney's statement to the CI was non-testimonial. (Gov. Resp. at 16.) The government further argues that Pinkney's statement is admissible pursuant to Federal Rule of Evidence 804(b)(3). (*Id.*) For the reasons stated herein, Taylor's motion to sever is denied.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." *United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009) (quoting *Ryan v. Miller*, 303 F.3d 231, 247 (2d Cir. 2002)). The Court's analysis of whether the Confrontation Clause is violated by admission of a codefendant's out-of-

court statements "begins with the question of whether the statements are testimonial." *United States v. Saget*, 377 F.3d 223, 227 (2d Cir. 2004). If the statements are testimonial, they may not be admitted unless they were subject to prior cross-examination by the defendant against whom they are admitted. *Id.* at 226-27 (citing *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also Bruton v. United States*, 391 U.S. 123 (1968) (holding that, "where a non-testifying defendant's confession specifically inculpates a co-defendant . . . the practical and human limitations of the jury system cannot be ignored"). Where the statements are non-testimonial, on the other hand, their admission does not violate the Confrontation Clause as long as the statements "fall within a firmly rooted hearsay exception or demonstrate particularized guarantees of trustworthiness." *Id.* at 227 (citing *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)). The decision to sever a joint trial "is committed to the sound discretion of the trial judge." *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003); s*ee* Fed. R. Crim. P. 14(a) (permitting a district court to grant a severance of defendants if it appears that a defendant would be prejudiced by joinder of defendants for trial together).

Here, Pinkney's recorded statements clearly are non-testimonial because they were "statements to a confidential informant, whose true status [was] unknown to [Pinkney]." *Id.* at 229 (holding that a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*); *see also Bourjaily v. United States*, 483 U.S. 171 (1987) (holding that admission against the defendant of a declarant's conversation with a confidential informant in which he implicated the defendant did not violate the Confrontation Clause, even though the defendant did not have an opportunity to cross-examine the declarant). Thus, the Court must determine whether Pinkney's recorded statements "fall within a firmly rooted hearsay exception or demonstrate particularized

guarantees of trustworthiness." *Saget*, 377 F.3d at 227.

First, Pinkney's recorded statement is admissible pursuant to Federal Rule of Evidence 804(b)(3) ("Rule 804(b)(3)"). Under Rule 804(b)(3) a statement by an unavailable declarant "may be admitted . . . only if the district court determines that a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *Saget*, 377 F.3d at 231 (citing *Williamson v. United States*, 512 U.S. 594, 599-603 (1994)). As a preliminary matter, Pinkney is "unavailable" as a witness for the purposes of Rule 804(b)(3) if he refuses to testify at trial. *See United States v. Matthews*, 20 F.3d 538, 545 (2d Cir. 1994) (finding that "[a] declarant who invokes his Fifth Amendment privilege against self-incrimination and refuses to testify at trial is unavailable for purposes of Confrontation Clause analysis"). Although Taylor claims that Pinkney may waive his privilege against self-incrimination and testify at trial, to date Pinkney has not given the Court any indication that he intends to do so. Moreover, it is clear, based on the substance of Pinkney's statements in which he confessed to having committed multiple homicides and several shootings, and expressed a lack of remorse for these actions, that a reasonable person in Pinkney's shoes would perceive the statement as detrimental to his penal interest.

Pinkney's statements, which incriminate both him and Taylor, also "contain particularized guarantees of trustworthiness." *Saget*, 377 F.3d at 230; Fed. R. Evid. 804(b)(3)(B) (requiring that evidence admitted under Rule 804(b)(3) be supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability). "[A] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the declarant believes is an ally, and the circumstances indicate that those portions

of the statement that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement." *Saget*, 377 F.3d at 230 (citing *United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995)). Pinkney's statements were made to a cellmate, whom he was unaware was acting as an agent for the government. He emphasized his own role in the Barnett murder, and "derided Taylor's unwillingness to perform the Barnett murder himself" (Gov. Resp. at 19), undermining Taylor's claim that the portions of Pinkney's statement inculpating Taylor are less reliable than the self-inculpatory portions of the statement. (Taylor Reply at 6, Doc. Entry No. 135). Pinkney's statement does not incriminate Taylor more in the Barnett murder than it incriminates Pinkney. Courts have found "sufficient guarantees of trustworthiness" where the declarant does not appear to have been "attempting to shift criminal culpability from himself" to the defendant. *Saget*, 377 F.3d at 230; *Sasso*, 59 F.3d at 350; *United States v. Rahme*, 813 F.2d 31, 36-37 (2d Cir. 1987) (finding statements sufficiently reliable where a declarant's statements implicated both himself and the defendant).

The government also indicates that it intends to introduce additional evidence at trial corroborating Pinkney's recorded statement. For example, the government intends to present testimony from a cooperating witness corroborating both Taylor and Pinkney's participation in the Barnett murder. (Gov. Resp. at 20.) Specifically, the government claims that the cooperating witness will testify that: (1) he was aware of Taylor's dispute with the murder victim; (2) he witnessed Taylor and Pinkney drive towards the scene of the shooting; and (3) Taylor returned a short time later to inform the witness that Pinkney had shot the "wrong guy." (*Id.*)

Taylor questions the reliability of Pinkney's statement, claiming, for example, that Pinkney is generally untrustworthy and his statements were motivated by ill-will towards Taylor. (Taylor Reply at 5-6.) However, the content of Pinkney's statement, the circumstances

surrounding his confession, and the additional evidence that the government intends to present provides more than sufficient support for a finding that Pinkney's statements bear "sufficiently particularized guarantees of trustworthiness, such that their admission [would] not violate the Confrontation Clause." *Saget*, 377 F.3d at 231. Thus, Pinkney's statement is admissible against both Pinkney and Taylor.

To the extent that portions of Pinkney's statement are irrelevant or not "individually self-inculpatory," these portions may be inadmissible. (Taylor Reply at 4-5 (citing *Williamson*, 512 U.S. at 600-01 (1994) (finding that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"))). The government has indicated that it intends to submit a proposed redacted version of Pinkney's statement striking statements that refer only to bad acts by Taylor. (Gov. Resp. at 16, n.6.) The government is directed to submit a transcript of Pinkney's statement indicating which portions it intends to redact for the Court's review no later than May 8, 2014. Nonetheless, the potential that certain portions of Pinkney's statement are inadmissible is not a sufficient reason to sever the defendants' trial under the circumstances present in this case. Accordingly, Taylor's motion for severance is denied.

## IV. Pinkney's Motion to Compel Production of *Brady* Material

Defendant Pinkney moves to compel the government to clarify what *Brady* material exists. (Pinkney Mem. at 10.) Pinkney acknowledges that the government already has provided *Brady* materials, but he requests that the government forward him any additional material "in a timely manner." (*Id.* at 12.) The government opposes, contending that no further disclosures are necessary. (Gov. Resp. at 23.) For the reasons stated herein, Pinkney's motion for discovery pursuant to *Brady* is denied. However, the denial is without prejudice as the government has a

continuing duty to disclose *Brady* material as described below.

"*Brady* requires that the government disclose material evidence favorable to a criminal defendant." *United States v. Mahaffy*, 693 F.3d 113 (2012). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867 (2006). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982)); *United States v. Weaver*, 2014 WL 259486, at *1 (E.D.N.Y. Jan. 10, 2014) (finding that "[w]hile . . . the Government may not properly conceal exculpatory evidence from a defendant, [*Brady*] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case"). "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Guerrero*, 959 F. Supp. 2d 523, 531 (S.D.N.Y. 2013) (quoting *Zackson*, 6 F.3d at 918).

With respect to the timing of disclosure, "as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Coppa*, 267 F.3d at 144;

*Weaver*, 2014 WL 259486, at *1. "[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence . . . as well as the particular circumstances of the case." *Coppa*, 267 F.3d at 146. Given the difficulty in determining materiality prior to trial, the Second Circuit has declined to specify a precise meaning for the phrase "in time for effective use." *See United States v. Rodriguez*, 496 F.3d 221, 227–28 (2d Cir. 2007). Thus, a district court has the discretion to order *Brady/Giglio* disclosure at any time as a matter of "sound case management." *United States v. Nogbou*, 2007 WL 4165683, at *3–4 (S.D.N.Y. Nov. 19, 2007); *United States v. Giffen*, 379 F. Supp. 2d 337, 347 (S.D.N.Y. 2004). Indeed, "in some cases, mid-trial disclosure may be adequate where defense counsel, before the start of cross-examination, is given the opportunity to cross-examine the witness outside the presence of the jury." *Rodriguez*, 496 F.3d at 228 n.6; *see also United States v. Rivera*, 60 F. App'x 854, 858 (2d Cir. 2003) (finding no *Brady* violation where exculpatory information was not revealed until government witness's direct testimony).

Here, the government already has disclosed to defendants identifying information for witnesses who potentially may provide exculpatory evidence more than one year before the start of trial. The government also agreed to assist defense counsel in locating those witnesses. It is not clear from Pinkney or the government's submissions what steps the defendant has taken to utilize the information that has been provided by the government. To the extent that the defendant has failed to take the government up on its offer to assist him in locating these witnesses, he cannot be now heard to complain that he does not have sufficient information to locate them. Such disclosure alone has been held to satisfy the *Brady* requirements in this Circuit. *See e.g.*, *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997); *Williams v. Bennett*, 2003 WL 21143070, at *8 (E.D.N.Y. Jan. 3, 2003) (finding no *Brady* violation where defendant

was aware of the identity of a possible witness to the crime); *see also United States v. Jackson*, 345 F.3d 59, 70 (2d Cir. 2003) ("[T]he government must [also] disclose exculpatory and impeachment materials pertaining to nontestifying witnesses.")  Pinkney has not identified any additional *Brady* materials that the government might possess, and the court sees no apparent *Brady* violation.  Based on the foregoing, the Court declines to direct the government to make additional disclosures at this time.  Should the government discover additional *Brady* material, it is directed to make further disclosure in a timely manner as discussed above.

## V.  Pinkney's Motion for a Bill of Particulars

Defendant Pinkney requests that the government provide a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure ("Rule 7(f)").  (Pinkney Mem. at 12-13.) Pinkney contends that the indictment fails to provide sufficiently specific information that would allow him to "prepare his defense, to avoid surprise at trial, or plead [double] jeopardy in the event that he is retried on the same offenses."  (*Id.* at 13.)  He requests that the government identify "the locations of the alleged acts" and the identities of those referred to as "others."  *Id.*

Rule 7(f) states that "[t]he court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits.  The government may amend a bill of particulars subject to such conditions as justice requires."  Fed. R. Crim. P. 7(f).  The Second Circuit has explained that the purpose of a bill of particulars is to provide a defendant with information concerning the details of the charge against him or her (1) if necessary to the preparation for trial, (2) to avoid prejudicial surprise at trial, or (3) to preclude a second prosecution for the same defense.  *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007) (citing *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988)); *see also United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir.

1991).

In addition, a bill of particulars is required only when "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he [or she] is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)). The applicable standard for whether a bill of particulars should issue is not whether the information sought would be helpful to the defense, but whether it is necessary. *United States v. McPherson*, 2009 WL 4756470, at *2 (S.D.N.Y. Dec. 11, 2009). Moreover, "[a] bill of particulars is not required where the information sought by the defendant has been made available in alternative forms." *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000) (citations omitted). Nor is it required if it would "force the Government to particularize all of its evidence." *Id.* at 584 (citations omitted).

A bill of particulars may not be used by the defense as a fishing expedition or to force the government to reveal all its evidence before trial. In general, "[a]cquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234 (citation omitted); *United States v. Chen*, S1 05 Cr. 938 (DAB), 2007 U.S. Dist. LEXIS 57917, at *31 (S.D.N.Y. Aug. 1, 2007) (enumerating and describing cases rejecting defendants' requests for the "'wheres, whens and with whoms' of the crime charged"). The court cannot compel the Government to disclose through a bill of particulars "the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories." *United States v. Muhammad*, 903 F. Supp. 2d 132, 137 (E.D.N.Y. 2012).

As an initial matter, Pinkney's request for a bill of particulars is untimely as it was not made within fourteen days of his arraignment as required by Rule 7(f). Since the Court did not

grant defendant permission to move for a bill of particulars after fourteen days had passed, Pinkney's failure to move timely justifies denial of his request for a bill of particulars. Nonetheless, the Court considers the motion on its merits and, for the reasons set forth below denies the motion in its entirety.

In this case, the government has provided discovery (including potential *Brady* material) and described the alleged crimes and Pinkney's involvement during motion practice. Specifically, the government's submissions to the Court on August 20, 2012, October 25, 2012, October 26, 2012, September 30, 2013, and March 3, 2014 contain many details about the charges brought against both defendants in this case. (*See* Gov. 8/20/12 First Motion *In Limine*; Gov. 10/25/12 Second Motion *In Limine*, Doc. Entry No. 78; Gov. 10/26/12 Let. re: Fingerprint Evidence, Doc. Entry No. 79; Gov. 9/30/13 Let., Doc. Entry No. 118; Gov. Mem.) For example, the government's submissions contain information about "the locations of the alleged acts," as requested by Pinkney. (*See* Gov. 8/20/12 First Motion *In Limine* at 2; Gov. Mem. at 3, 5.) Pinkney has failed to identify any necessary information that has not already been produced by the government through the Superseding Indictment, discovery, or motion practice. *See Kelly*, 91 F. Supp. 2d at 584 (the government is not required to "particularize all of its evidence"); *Muhammad*, 903 F. Supp. 2d at 137 (courts cannot compel the government to disclose "the precise manner in which a defendant committed the crimes charged").

Moreover, requiring the government to identify any unindicted coconspirators would be inappropriate under the circumstances of this case. Although "[c]ourts in this Circuit are divided on the question of when the Government should be required to identify alleged co-conspirators in a bill of particulars," identification is generally inappropriate "in cases where the defendant is charged with 'extreme acts of violence' in order to protect the government's investigation and

the safety of unindicted co-conspirators." *United States v. Barrera*, 950 F. Supp. 2d 461, 477-79 (E.D.N.Y. 2013) (citing *United States v. Urso*, 369 F. Supp. 2d 254, 273 (E.D.N.Y. 2005) and *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006)). In this case, Taylor and Pinkney are charged, *inter alia*, with intentional murder and with conspiracy to commit murder. (*See* Superseding Indictment). Moreover, in its motion for an anonymous jury, the government has outlined additional evidence showing that the defendants have engaged in acts to obstruct justice and intimidate cooperators against testifying. (*See* Section VII, below.) Pinkney has not identified any factors favoring disclosure. *See Barrera*, 950 F. Supp. 2d at 477 (finding that "where courts have granted disclosure in cases involving allegations of violent crime, 'there were other factors that convincingly militated in favor of disclosure. . .'"). Therefore, disclosure of the identities of coconspirators is not warranted.

For all of the foregoing reasons, Pinkney's request for a bill of particulars is denied.

## VI. Government's Motion to Admit Evidence of Uncharged Bad Acts

### a. *Pinkney's Prior Bad Acts*

The government moves to admit evidence that Pinkney regularly possessed a firearm and sold crack in furtherance of the narcotics conspiracy charged in the Superseding Indictment. (Gov.'s Mem. at 1-2, 19.) Specifically, the government seeks to present testimony from cooperating witnesses concerning specific firearms that Pinkney possessed while serving as one of Taylor's enforcers and eyewitness testimony concerning Pinkney's distribution of crack. (*Id.* at 19.) The government also seeks to introduce evidence of Pinkney's December 11, 2004 arrest for possession of a firearm near 34 Weirfield Street in Brooklyn, which the government claims constitutes direct proof of Pinkney's participation in the narcotics conspiracy. (*Id.* at 19-20.) Pinkney does not oppose the government's request to elicit testimony concerning Pinkney's

firearm possession and distribution of crack while serving as one of Taylor's enforcers. (*See* Pinkney Resp., Doc. Entry No. 133.) However, Pinkney opposes the introduction of his December 11, 2004 arrest,[2] arguing that this evidence "improperly implicates Pinkney's character and his propensity for criminal conduct." (Pinkney Resp. at 3.) For the reasons set forth below, the government's motion to introduce evidence of uncharged bad acts is granted.

"[E]vidence of uncharged criminal activity is not considered other crimes evidence under [Rule] 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotations and citation omitted). Accordingly, "[where] the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks and citations omitted); *see also United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."). Nonetheless, such evidence may be inadmissible pursuant to Federal Rule of Evidence 403 ("Rule 403"), even if relevant, if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

The evidence the government seeks to admit is admissible as direct evidence of the crimes charged, and, specifically, were acts done in furtherance of the narcotics trafficking conspiracy. Pinkney is charged with conspiring, between August 2, 2000 and August 2, 2010, to distribute and possess with the intent to distribute heroin, cocaine, and crack, drug-related

---

[2] Pinkney asserts in his response that the government seeks to admit all of Pinkney's arrests and convictions. (Pinkney Resp. at 2-3.) In fact, the government only seeks to admit Pinkney's December 11, 2004 arrest. (*See* Gov. Mem.)

murder, drug related murder conspiracy, and use of a firearm. (Superseding Indictment ¶¶ 1-3, 10.) The uncharged acts the government seeks to admit are related to the charged crimes in time, place, and nature. Notably, on December 11, 2004, Pinkney was arrested within one block of 34 Weirfield Street, the location where Taylor allegedly stored narcotics and firearms as part of the alleged drug trafficking conspiracy.[3] (Gov. Reply at 10-11, Doc. Entry No. 136.) Thus, Pinkney's December 11, 2004 arrest occurred during the course of the drug trafficking conspiracy near a location key to the conspiracy. Moreover, the act for which Pinkney was arrested – possession of a firearm – arguably was committed in furtherance of the alleged conspiracy. In short, since the drug trafficking conspiracy allegedly involved many acts of violence and firearm related murder, Pinkney's arrest for firearm possession at one of the key locations of the conspiracy is inextricably intertwined with the crimes charged in this case.

Notably, the government takes a restrained, narrow approach, seeking to admit just one arrest out of Pinkney's eleven arrests, four felony firearm convictions, and one youthful offender adjudication. (Gov. Reply at 11.) Under all of the circumstances, the evidence the government seeks to admit will not implicate improperly Mr. Pinkney's character and propensity for criminal conduct. The danger of unfair prejudice does not outweigh the probative value of the proffered evidence because it does not involve conduct more inflammatory than the charged crimes. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). Since the evidence is admissible as direct evidence of the conspiracy, the Court need not address the government's alternative theory that the prior conduct and convictions are admissible under Rule 404(b).

Accordingly, the government's motion to introduce evidence of uncharged bad acts is granted.

---

[3] On April 10, 2003, Taylor was arrested at the same address for possession of crack. (Gov. Mem. at 21.)

b.     *Taylor's Shooting of V-1*

The government also seeks leave to introduce Taylor's December 16, 2005 shooting of an individual identified at this time as "V-1." (Gov. Mem. at 5, n.1.)  In its August 20, 2012 motion *in limine*, the government moved to introduce evidence that defendant Taylor shot Michael Blocker on October 3, 2006.  (*Id.*)  The government claims that it has since learned that the shooting actually occurred on December 16, 2005 and was not against Blocker, but rather V-1. (*Id.*)  The government asserts, however, that all of the circumstances of the shooting are as the government previously represented in connection with its August 20, 2012 motion *in limine*. (*Id.*)  The government contends that its arguments in furtherance of admissibility of the shooting are the same, "and indeed stronger in light of the temporal proximity of the V-1 and Pinkney shootings and the location of the October 3, 2006 shooting, which was only three blocks from a focal point of the conspiracy at 43 Weirfield Street."  (Gov. Mem. at 5, n.1.)

Taylor opposes the government's motion simply by requesting that the Court reconsider its November 14, 2012 Memorandum and Order in light of the government's disclosure.  (Taylor Resp. at 11.)  Taylor also seeks disclosure of *Brady* material, arguing that one or more of the government witnesses must have provided false information about defendant Taylor's involvement in the shooting of Michael Blocker.  (*Id.*)  According to Taylor, information about the shooting of V1 "puts into question the reliability of previously proffered information."  (*Id.* at 12.)

The Court's November 14, 2012 Memorandum and Order granting the government's request to admit evidence of the Blocker shooting was based on all of the circumstances of the incident, including the government's allegation that the shooting "occurred at the direction of [Taylor] in order to discipline and intimidate rivals after [Taylor]'s former narcotics associates

shifted their allegiance to one of [Taylor]'s rivals." *United States v. Taylor*, 2012 WL 5546835, at *3 (E.D.N.Y. Nov. 14, 2012). The Court found that evidence of the Blocker shooting was "admissible to show, among other things, the existence of the charged narcotics conspiracy, the development the relationship between [Taylor] and his alleged coconspirators, the mutual trust between the coconspirators, and [Taylor]'s leadership role in the conspiracy." *Id.* The government's error with respect to the name of the victim and the date of the incident does not alter the Court's analysis. Accordingly, Taylor's request that the Court reconsider its decision is denied.

Moreover, despite Taylor's contention that the government's mistake must have been the result of false information from a government witness, the government asserts that it does not possess *Brady* material in the form of contradictory witness reports. (Gov. Reply at 10, n. 4.) Instead, the government contends that the error "was the government's alone in locating a police report of what it believed to be the shooting, and later learning that the incident was not the same one that the witness had described." (*Id.*) According to the government, the error "resulted from certain shared facts concerning the two incidents," including the fact that both victims have the same first name and were associated with Taylor. (*Id.* at 9.) Since the mistake was a result of government error rather than false information received from an informant, Taylor's motion for disclosure of *Brady* material is denied.

## VII. Government's Motion for an Anonymous Jury

The government moves for an anonymous and partially sequestered jury, arguing that the defendants' incentive to obstruct justice is high and that an anonymous jury is necessary to ensure the impartiality of the jury and the integrity of the trial process. (Gov.'s Mem. at 1.) Specifically, the government requests that: (1) the names, addresses, and workplaces of

members of both the venire and petit jury not be revealed; (2) the jurors eat lunch together and be accompanied in and out of the courthouse by members of the United States Marshals Service each day; and (3) the jurors be required to complete an anonymous jury questionnaire. (*Id.* at 1-2.) The government also requests that the Court instruct the jury that anonymity is necessary to protect the jurors' privacy or to make them feel more comfortable in giving candid answers to the personal questions asked in *voir dire*. (*Id.* at 18.) Taylor and Pinkney oppose, arguing that "the Court should implement a system whereby only defendants' counsel and not their clients will have access to" the juror's names, addresses, and workplaces. (Taylor Resp. at 2; Pinkney Let., Doc. Entry No. 134.) Defendants request that the Court instruct the jury that "their anonymity is only being protected due to media scrutiny surrounding the case." (Taylor Resp. at 2.)

"The decision whether or not to empanel an anonymous jury is left to the district court's discretion." *United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006). In resolving motions for anonymous and partially sequestered juries, courts must balance "the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *United States v. Quinones*, 511 F.3d 289, 295 (2d Cir. 2007) (holding that the district court did not abuse its discretion in impaneling an anonymous jury). It is well settled in the Second Circuit that, "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights"; however, analysis of the potential constitutional impact of an anonymous jury on a defendant "must receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense." *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991). It is appropriate to

impanel an anonymous jury when (i) there is "strong reason to believe that the jury needs protection" and (ii) reasonable precaution is taken "to minimize the effect that such a decision might have on the jurors' opinions of the defendants." *Gotti*, 459 F.3d at 345.

Factors that courts have considered in determining whether to impanel an anonymous jury include: (1) a defendant's demonstrated "willingness to tamper with the judicial process," such as threats made to witnesses or informants; (2) the dangerousness of a defendant as demonstrated by the seriousness of the crimes charged; and (3) the anticipated media coverage. *Quinones*, 511 F.3d at 296; *see United States v. Wilson*, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006); *see also United States v. Khan*, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (compiling case law). If a court, based on an evaluation of these factors, determines that an anonymous jury is warranted, it must protect the defendant's fundamental rights by conducting *voir dire* in a manner "designed to uncover bias as to issues in the cases and as to the defendant," and provide the jurors with a "plausible and nonprejudicial reason for not disclosing their identities." *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994); *see also United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991).

Here, the relevant factors counsel in favor of selecting an anonymous jury. Taylor has a history of attempting to interfere with the judicial process. The government alleges that Taylor has attempted to identify and intimidate witnesses against him while this case has been pending. (Gov. Mem. at 6, 15.) First, MDC officials intercepted a letter that Taylor attempted to send to an associate, containing "the portion of the government's [August 20, 2012] motion referring to [] cooperating defendants' testimony." (*Id.*) Taylor used a false name and inmate registry number to hide his identity as the sender of the letter. (*Id.*) The government believes that Taylor sent the letter in order to "alert the recipient to the cooperating defendants' testimony and likely

. . . their identities." (*Id.* at 6-7.) Second, the government provided Jenks Act, 18 U.S.C. § 3500 material ("3500 material") in anticipation of trial in October 2012, which included reports of interviews with a cooperating defendant ("CD"). (*Id.* at 7.) The CD immediately began receiving messages sent to him by a third party on Taylor's behalf that he should not testify at trial, and, in November 2012, the CD was assaulted and severely beaten on the street in Bushwick. (*Id.*) The government also cites several recorded telephone calls demonstrating Taylor's influence over his contacts outside of prison. (Gov. Reply at 3-5.) Taylor argues that none of the government's allegations have been proven and it is unlikely Taylor "continues to exercise control over 'allies outside of the prison system . . . .'" (Taylor Resp. at 8-9.) The proof tendered by the government squarely contradicts these arguments. The Court finds that the government has plausibly demonstrated Taylor's willingness to tamper with the judicial process and his ability to influence others in doing so.

Moreover, the defendants' are charged with very serious crimes in this case, involving many acts of violence. Taylor is charged with "paying underlings to commit two unrelated contract murders, one of which resulted in the murder of an innocent victim." (Gov. Mem. at 14.) Pinkney is charged with killing a stranger at Taylor's behest for only $1,000. (*Id.*) As alleged by the government, both murders were committed in furtherance of a narcotics trafficking conspiracy responsible for distributing significant quantities of illegal drugs. (*Id.*) Defendants concede that the charges are serious, but contend that "defendants who commit violent offenses are not necessarily prone to jury tampering." (Taylor Resp. at 7.) While it cannot be doubted that some violent defendants are not prone to jury tampering, the government has alleged specific attempts by defendant Taylor to obstruct the judicial process. Moreover, jurors presented with evidence of the alleged crimes committed in this case likely would

experience extreme fear, discomfort, and intimidation from the knowledge that their identities were known to the defendants. Accordingly, this factor militates in favor of an anonymous jury.

Notably, as discussed in detail in Section II. a. above, Pinkney was recorded, post arrest, bragging to his cellmate about his many acts of violence and his utter lack of reluctance in committing such acts. He further recounted acts of violence that Taylor engaged in as well. This evidence, too, militates in favor of an anonymous jury.

With respect to anticipated media coverage, the government argues that "the local press has taken interest in similar cases in the past," and that "publicity would increase the possibility that jurors would be exposed to intimidation or harassment." (Gov. Mem. at 16 (citing *United States v. Gammarano*, 2007 WL 2077735, at *6 (E.D.N.Y. July 18, 2007)). Defendants contend that "there is nothing to suggest that the impending trial . . . will attract the type of media attention which will likely result in the names of jurors being made public." (Taylor Resp. at 9.) Defendants do not object, however, "to a procedure that allows the parties access to the names and other information concerning the jurors while withholding that information from the public record." (*Id.* at 10 (citing *ABC, Inc. v. Stewart*, 360 F.3d 90, 104 (2d Cir. 2004)). The Court finds that, irrespective of the potential media coverage of this case, the seriousness of the charges brought in this case and Taylor's attempts to tamper with the judicial process themselves provide a "strong reason to believe that the jury needs protection." Accordingly, the Court finds that an anonymous jury is appropriate.

Having found that an anonymous jury is warranted, the Court must protect the defendant's fundamental rights by conducting *voir dire* in a manner "designed to uncover bias as to issues in the cases and as to the defendant," and provide the jurors with a "plausible and nonprejudicial reason for not disclosing their identities." *United States v. Thai*, 29 F.3d at 801

(2d Cir. 1994); *see also Gotti*, 459 F.3d at 345.  The Court finds that a jury questionnaire that provides the parties with detailed information about potential jurors will allow the defendants to make informed decisions during jury selection.  The juror's names, addresses, and places of employment, are not vital to the defendants' ability to uncover bias among jurors.  Additionally, an appropriate instruction to the jury may "minimize the effect that [anonymity] might have on the jurors' opinions of the defendants."  *Gotti*, 459 F.3d at 345.  To that end, the Court will instruct the jury that:  1) their privacy and their identities require protection from the media and the public; 2) anonymity will allow them to feel more comfortable giving candid answers to the personal questions asked in the jury questionnaires; and 3) that they are being escorted in and out of the courthouse to protect their privacy and to ensure a timely start to each day of the trial.

In sum, the government's motion for an anonymous and partially sequestered jury is granted, as is its request for an appropriate jury instruction.

**<u>CONCLUSION</u>**

For the reasons set forth above, the government's motion for an anonymous and partially sequestered jury is granted; the government's motion to admit uncharged acts is granted; defendant Taylor's motion for severance is denied; Taylor's motion for reconsideration of the Court's November 14, 2012 Memorandum and Order is denied; Pinkney's motion for suppression is denied; Pinkney's motion for clarification of what *Brady* materials exist is denied; and Pinkney's motion for a bill of particulars is denied. The government is directed to submit a transcript of Pinkney's statement indicating which portions it intends to redact for the Court's review by May 8, 2014.

SO ORDERED.

Dated: Brooklyn, New York
        April 24, 2014

_____
            /s/
DORA L. IRIZARRY
United States District Judge
