

# MARGARET M. SHALLEY
## & ASSOCIATES, LLC

OF COUNSEL:
JAMES M. BRANDEN
JAMES SHALLEY

October 25, 2016

**BY ECF & MAIL**
The Honorable Dora L. Irizarry
Chief United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re: *United States v. Shaun Taylor*
           10 Cr. 268 (S2) (DLI)

Dear Judge Irizarry:

  I represent Shaun Taylor in the above-referenced matter. This letter is respectfully submitted pursuant to Rule 32 of the Federal Rules of Criminal Procedure and sets forth several matters that Mr. Taylor will raise to aid in the determination of an appropriate sentence, serving the interests of justice and sentencing goals of 18 U.S.C. § 3553(a). On September 8, 2014, Mr. Taylor was found guilty after a jury trial of all 12 Counts in the second superseding indictment. As a result, Mr. Taylor faces a mandatory minimum sentence of life plus 50 years. Mr. Taylor acknowledges the seriousness of his convictions and recognizes that the Court must sentence him to life imprisonment. However, he requests that the Court consider his individual background and unique characteristics as set forth in the Presentence Report and the letters from family and friends attached to this sentencing submission.

## BACKGROUND

  Given that Mr. Taylor was convicted of Counts Six and Seven (18 U.S.C. § 1958), he faces a mandatory life sentence on each count. The murders occurred when the defendant was 20 and 22 years old, respectively. Mr. Taylor was born in Brooklyn, New York in 1984. His parents, Ronald Taylor and Marjorie Ennon, divorced when he was five years old following his

225 BROADWAY • SUITE 715 • NEW YORK, NY • 10007
(212) 571-2670 • FAX (212) 566-8165
MARGARETSHALLEY@AOL.COM

father's struggles with drug abuse. Although his father was absent for most of his life, Mr. Taylor now shares a good relationship with his father. After his parents' divorce, Mr. Taylor's father moved to Florida and eventually remarried. Mr. Taylor's mother resides in New York and works as a train conductor for the Metropolitan Transit Authority. Following her divorce, in 1991 she began a relationship with Mr. Taylor's stepfather, Albert Young III. Mr. Taylor viewed his stepfather as his true father figure and the two shared a close relationship. Sadly, when Mr. Taylor was approximately fourteen years old, his stepfather passed away from heart failure, leaving Mr. Taylor devastated. It was around this time that Mr. Taylor began smoking marijuana on a daily basis to help him escape from reality. His marijuana use became an addiction ending with Mr. Taylor smoking seven to ten blunts a day. At this time, he was attending EBC Bushwick High School; his grades suffered tremendously and his family thought it would be best for him to move to Florida with his father, hoping that a change of scenery might improve his mental health. Unfortunately, he continued to receive failing grades in Florida, and after six months, he moved back to New York.

Mr. Taylor returned to New York to a family still grieving from his stepfather's death. He felt lost, unfocused and continued to struggle in school. He was arrested for attempted criminal possession of a controlled substance in the third degree. In 2002, Mr. Taylor began treatment at an eight-month in-patient drug treatment program in Staten Island. There he worked diligently to battle his addiction and attempted to turn his life around. While attending the program, Mr. Taylor earned his GED diploma. After completing the program he remained drug-free for one year. In June 2007, Mr. Taylor attended the Center for Community Alternatives in Brooklyn to again combat his marijuana addiction. He continued to test negative for illicit substances from August 2007 until his graduation from the program in February 2008. Between August and December of 2007, Mr. Taylor attended Kingsborough Community College in Brooklyn. He completed three credits and stopped attending once he was arrested for his first Federal matter.

Mr. Taylor has two sisters, Dynesha Taylor, age 32, his maternal sister, and Nia Young, age 18, his maternal half-sister. He shares very close relationships with his siblings, and treats his youngest sister, Nia, "like his own daughter." Mr. Taylor also has a nine-year-old daughter, "ST", from a prior relationship with Tatiana Vazquez. A letter from Ms. Vazquez is attached as Exhibit 1. Mr. Taylor shares a close, loving relationship with his daughter, but sadly he has been incarcerated since before her birth. In fact, Tatianna first learned that she was pregnant within days before Mr. Taylor's arrest on his first federal indictment. She states that the day he was arrested was "the worst day of my life." Mr. Taylor speaks with his daughter regularly; however, it has been difficult for her not being able to see him on a regular basis, and she cries for him to come home. Now that she is older, she yearns to spend time with her father out in the real world, and constantly asks for him to come home, to pick her up from school and to take her to the park. Mr. Taylor speaks to his daughter every day and visits with her regularly. Mr. Taylor and Ms. Vazquez are no longer in a romantic relationship, yet they remain close and she has been supportive of him throughout this matter, and is committed to ensure that Mr. Taylor's deep bond with his daughter continues to grow.

A series of letters received from Mr. Taylor's family and friends all indicate surprise and dismay to learn of his involvement in this case, since the charges do not reflect the person whom

they know Shaun to be. His mother, Ms. Ennon, remains especially devastated by Mr. Taylor's incarceration since he is her only son. She has submitted a letter to the Court, which is attached as Exhibit 2. She describes Mr. Taylor as having excellent relationships with all of his family members, and says he 'would give the shirt off his back' to someone in need. She notes that Shaun had a difficult time coping with the sudden death of his stepfather, who served as a true father figure. She states that Shaun has changed tremendously since he has been incarcerated. He continuously reminds his younger family and friends "to stay in school and do the right things." Ms. Ennon remains heartbroken that Mr. Taylor has not been able to bond with his daughter outside of jail, and further states that "his absence has taken a tremendous toll on all our lives as we truly love and miss him." Following sentencing, Ms. Ennon hopes that Mr. Taylor will be incarcerated in a facility close enough to his family so they may continue to visit him. Attached as Exhibit 3, is a letter from Teja Gibbs. Although they have always been good friends, Teja and Shaun have become closer since his incarceration. She states, "Shaun's attitude on life is just full of such positivity" and that when you're around him, "you cannot help but see the better side of things…his ability to stay strong in his current situation is one to admire." She adds that Shaun never places judgment, has a kind heart, is very humble, respectful and loyal, and that she "couldn't ask for a better friend." The letter from Brenda Jackson, Shaun's aunt, attached as Exhibit 4, reflects Shaun was always generous and kind hearted and as a child and made sure his sister and cousin were taken care of, even though he was younger than them. As a teenager, he tried to provide emotional support for his two male cousins after their father died. Shaun is described as always uplifting others, and a pillar of strength, even now during his time of need.

Since entering BOP custody in May of 2008, Mr. Taylor has participated in numerous programs in an effort to educate himself and improve his emotional and mental health. He became a suicide companion, studied diversity awareness, HIV/AIDS awareness, drug education, substance abuse, stress management, anger management and math preparation. He has also participated in many athletic and physical education courses, including circuit sprint training, men's health, basic exercise, boot camp aerobics, sports nutrition, weight management and cross training. Additionally, Mr. Taylor worked while incarcerated at the Metropolitan Detention Center from 2012 to 2015, and currently works as an orderly in 5 North at the Metropolitan Correctional Center.

## OBJECTIONS TO THE PSR

### The Offense Conduct

16-17. Notwithstanding the convictions on all counts, the defendant denies the allegations set forth in these paragraphs.

18. Mr. Taylor denies knowing Joseph "Chino" Carmoega, a street level drug dealer, and as noted in the government's December 19, 2014 and July 25, 2015 objections to the PSR, the government does not possess any information that Mr. Taylor knew Carmoega.

19. The defendant admits that D'Andre "Cuba" Yelverton bought drugs from him on three occasions; however, he denies asking Yelverton or anyone else to shoot or kill Joseph "Joey Crack" Vargas. (Tr. 1776, 1777, 1778).

**Narcotics Distribution Conspiracy**

**20-22.** The defendant denies the allegations contained in paragraphs 20-22 except that although he was not a member of said conspiracy, he did sell heroin, cocaine and crack from 2001 until June of 2007. (Tr. 1726, 1732, 1736, PSR ¶ 99). The defendant also admits selling drugs to Yelverton and to Jaquan Petty. (Tr. 1778, 1812). The defendant denies the rest of the allegations in these paragraphs including but not limited to requesting any acts of violence by Timothy "Little Timmy" Pinkney, using Pinkney as an enforcer, obtaining drugs from the Vargas-Briggs conspiracy or having any involvement in the criminal activity of Briggs or Vargas. He also denies hiring street level dealers as enforcers and having a feud with a rival drug dealer.

**Firearms**

**23-25.** The defendant denies all allegations in Paragraph 23 through 25, specifically, maintaining an arsenal of guns, any involvement in the shooting of Pinkney, Michael Turner Cole or Craig Phillips, and any involvement in the murder of Terrance Barnett in April 2005 or Joseph Vargas in June 2007. (Tr. 1764).

**The Murder of Terrence Barnett**

**26-28.** Although convicted of this murder at trial, Mr. Taylor denies recruiting Pinkney to murder Barnett and any involvement in the murder of Barnett. (Tr. 1758-59). Defendant admits that in approximately September 2004, Yellow stole his phone that contained contact information for his suppliers and customers. (Tr. 1754-55). Notably, Mr. Taylor resolved the phone incident with Yellow approximately two or three days later, and replaced the original phone with a new phone with the same phone number. (Tr. 1756). Thus, there was no reason to retaliate against Yellow, and the defendant denies any involvement in the murder.

**The Murder of Joseph Vargas**

**29-40.** Although convicted of this offense conduct, Mr. Taylor denies that between January and June 2007 he was involved with Tyler Briggs in a scheme to ship cocaine from Puerto Rico to New York. He also denies that he and Briggs stole cocaine from Joseph Vargas and that he hired Yelverton and Petty to murder Vargas. Mr. Taylor also denies phone conversations with Yelverton and Petty while they were at Rikers Island.

**Obstructive Conduct**

**41-42.** Although Mr. Taylor admits trying to find out who the cooperating witnesses were against him, he denies engaging in any obstructive conduct or acts of violence against cooperating witnesses.

4

### The Defendant's Participation

**46.** Mr. Taylor denies being a member of the conspiracy and denies any involvement in the murders charged.

**47-54.** Although Mr. Taylor was convicted of the conduct contained within these paragraphs, he denies all the factual allegations.

**55.** Mr. Taylor denies that Pinkney acted as an enforcer for him and carried a firearm in furtherance of Taylor's drug trafficking.

**56.** Mr. Taylor denies directing Yelverton to murder Joseph Vargas, or shoot and wound his brother, John Cruz.

**61.** Again, Mr. Taylor denies hiring Yelverton to kill Joseph Vargas.

## OFFENSE LEVEL COMPUTATION

### Offense Level Computation

**84-93.** Mr. Taylor denies committing the charged drug offenses and denies ordering or participating in the murders of Terrance Barnett and Joseph Vargas. He thus objects to the entire guideline calculation. However, since Mr. Taylor was convicted of all counts and anticipates the Court sentencing him pursuant to the jury verdict, the defense agrees with the analysis of the guidelines appearing in the Government's December 23, 2014 letter to Probation. However, Mr. Taylor specifically objects to the adjustments for obstruction of justice set forth in Paragraphs 68, 74 and 80, and denies intimidating possible cooperating witnesses as set forth in Paragraphs 73 and 79. He objects to the two point adjustments for aggravating role, since he denies participating in the offense. Mr. Taylor submits that the counts should be grouped as follows:

| Counts | Adjusted Offense Level | Units |
|---|---|---|
| 1, 4 and 5 | 34 | 0 |
| 2 and 3 | 43 | 1 |
| 6-9, 12 | 43 | 1 |
| | Total Units: | 2 |
| Greater Adjusted Offense Level | 43 | |
| Increase in Offense Level | 2 | |

|                                   |    |
|-----------------------------------|----|
| Combined Adjusted Offense Level   | 45 |
| Total Offense Level               | 45 |

This analysis, although different from that of Probation and the government, results in the same sentence, life plus 50 years (two terms of 25 years running consecutively on the two gun counts[1]).

## THE APPROPRIATE SENTENCE

Mr. Taylor acknowledges that the Court must sentence him to life imprisonment plus 50 years on the two gun counts to run concurrently with the sentence presently being served pursuant to 5G1.3. Section 3553(a) tasks the sentencing Court with imposing a sentence that is both reasonable and "sufficient, but not greater than necessary, to comply with the purposes" reflected by the subsections of § 3553(a).

### (1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1)).

As the Court is aware, Mr. Taylor was convicted of all 12 counts in the superseding indictment, including participation in two murders. Although Mr. Taylor denies involvement in these offenses, Mr. Taylor is deeply saddened by the effect the deaths of Mr. Vargas and Terrance Barnett have had on their families and friends. (See PSR 44-45) He mourns the fact that Mr. Vargas' daughters and Mr. Barnett's son, Lorenzo will grow up without a father. He is deeply saddened by the fact that Mr. Cruz and Mr. Barnett's wife have not been able to heal from the loss of their loved ones.

Mr. Taylor's familial and personal relationships reveal a side of him that has yet to be seen by the Court. His friends and family consistently describe him as always giving to others and providing emotional support when needed. His cousin, Brandi Gales describes him as a light in her life, despite the time he is facing. *See* Exhibit 5. She describes the strength that he has exhibited throughout this time as evidence of his character as a man. Tatianna Vazquez, the mother of his daughter, ST, states that family is everything to Shaun and that he was always there emotionally to assist his mother and little sister. *See* Exhibit 1. She has taken their daughter to visit him since the child was two weeks old. He has strived to maintain contact with his daughter and be the best father he can be, despite being incarcerated. Mr. Taylor's longtime friend, Tawana Riley has also submitted a letter to the Court, which is attached as Exhibit 6. She describes Mr. Taylor as a supportive, understanding, loving man who was "raised by a strong woman" but lost his father at a young age. She met Shaun in 2003 and notes that it was Mr.

---

[1] Notably, although in *United States v. Hill*, __ F.3d __, 2016 WL 4120667 (2d Cir. Aug. 3, 2016), the Second Circuit held that 18 U.S.C. § 924(c)(3)'s residual clause is not void for vagueness, the Federal Defenders office has sought a re-hearing in light of *Johnson v. United States*, 13 S. Ct. 2551 (2015). *See also United States v. Barret*, No. 14-573 (2d Cir. 2014) (currently pending in the Second Circuit). Additionally, the Supreme Court has granted certiorari in *Lynch v. Dimaya*, 803 F.3d. 1110 (9th Cir. 2015), which presents the question of whether 18 U.S.C. § 16(b) (which the government and the Second Circuit has described as materially identical to the residual clause of § 924(c)) is void for vagueness in light of *Johnson*. The decisions in these cases may effect whether the sentence on Count 11 runs consecutively to Counts 6 through 9.

Taylor's respect for his mother and sisters that initially drew her to forming a friendship with him. Victasia Sweat, a friend since she was a freshman in high school, describes him as a great dad, family member and friend, who has grown through his time in prison, and continues to strive to be the best man he can be. *See* Exhibit 7. His aunt, Vanadis Watson, describes Shaun as "our family rock" and notes that he is respected and looked up to within their family. *See* Exhibit 8. His niece, Kenya Watson, states that Shaun "is always full of life and always spoke life in to others." She recalls when she was a freshman in college that Shaun would call her every day to catch up, asking about her grades and how she was adjusting. She calls Shaun "the glue" that held their family together. *See* Exhibit 9.

Mr. Taylor's friend, Akeem Norville, notes that Shaun's primary focus now is to be the best support system that he can be for his daughter and immediate family despite being incarcerated. *See* Exhibit 10. Mr. Norville goes on to describe Shaun as a great friend providing emotional, physical or mental help when needed. This sentiment is echoed by Odalys Vazquez, who adds that Shaun has matured since being incarcerated and seeing his daughter grow up without him. *See* Exhibit 11. She adds that although he is incarcerated, he still manages to do as much as he can for his daughter and take care of his responsibilities. Shaun's niece describes him as someone who brightens up your mood. *See* Exhibit 12. Once he was incarcerated he would call regularly and ask her to watch out for his daughter and be a good influence on her. T. Williams states that since his incarceration Shaun is a changed man and very remorseful for his actions. *See* Exhibit 13. What is most significant about the man described in these letters is the number of people who Mr. Taylor has stayed in contact with and continues to influence in a positive way despite being incarcerated for the past eight years. He has done his best to maintain an active role in their lives while he is incarcerated. Counsel notes that Mr. Taylor is always upbeat and positive when looking ahead, an admirable quality under the circumstances.

Notably, Mr. Taylor was twenty-four years old when he was arrested for the instant offenses. The Court should consider that scientific studies on brain development indicate that a young person's brain lacks the full decision-making functions that are possessed by mature adults, and are therefore more likely to make poor decisions and engage in risky behavior. The Supreme Court has acknowledged the biological differences in maturity between young persons and adults. In *Gall v. United States*, 552 U.S. 38, 59 (2007), the Supreme Court reversed the Eight Circuit Court of Appeals and affirmed the decision of the District Court which held that the sentencing Court should account for age when reviewing the conduct of a defendant. *United States v. Gall*, 374 F. Supp.2d 758, 764 at footnote 2 (S.D. Iowa 2005). These cases both cited brain studies by the National Institute of Health[2] which found that the portion of the brain that controls decision making does not fully develop until a person reaches the age of twenty-five (25). *Gall v. United States* at 57-58; *United States v. Gall* at 764. Accordingly, persons under twenty-five face difficulty controlling impulses and considering the possible long-term consequences of their actions.[3] Mr. Taylor's age in no way excuses his involvement in selling

---

[2] *See* Elizabeth Williamson, Brain Immaturity Could Explain Teen Crash Rate, Wash. Post, Feb. 1, 2005 at A01 (summarizing a recent National Institutes of Health study that suggests 'that the region of the brain that inhibits risky behavior is not fully formed until age 25').

[3] *See* Risky Business, News In Health, Sep. 2011 at 1, available at https://newsinhealth.nih.gov/issue/Sep2011/feature1; *see also* Teen Brains: Still Under Construction, News In Health, Sep. 2005, available at https://newsinhealth.nih.gov/2005/september2005/docs/01features_02.htm

drugs or engaging in other risky behavior; however it does provide insight into his poor decision-making. Throughout the last eight years, Mr. Taylor has dramatically matured and is determined to do all that he can to make a positive life for himself while incarcerated.

**(2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(A)-(C)).**

Mr. Taylor faces a life sentence as a result of his conviction. Clearly, the offenses are serious and the sentence provides specific as well as general deterrence.

## CONCLUSION

Mr. Taylor is deeply saddened by the harm caused to the Vargas and Barrett families. He respectfully requests that the Court impose a sentence including educational and vocational training. The defendant respectfully reserves the right to raise additional issues at the time of his sentencing. The Court's time and consideration of this submission is greatly appreciated.

Respectfully submitted,

/ s /

Margaret M. Shalley

cc: AUSA Matthew Amatruda
AUSA David C. Pitluck
USPO Jeremy Reiss